# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| NORTH AMERICAN DEER REGISTRY, INC. | § § § | |
| v. | § § | Civil Action No. 4:17-CV-00062 |
| | § | Judge Mazzant |
| DNA SOLUTIONS, INC. | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff North American Deer Registry, Inc.'s Application for Preliminary Injunction (Dkt. #17). After reviewing the relevant pleading, motions, and evidence received at hearing, the Court finds the motion should be granted.

## BACKGROUND

The deer breeding industry is a potentially lucrative industry with single straws of buck semen selling for $5,000 to $20,000 on average, and ranging all the way up to $1 million to purchase the entire buck. Many deer are sold through auctions. Auction houses require a deer either to be registered, or if it is a fawn, to have a registration pending.

Breeders belong to several different deer associations nationwide. Before 2007, each association had its own registry. In particular, the Texas Deer Association and North American Deer Farmers Association (the "Associations") had their own registries. Under this system, information about a deer's lineage was often spread across several registries. If a breeder needed information about a deer from a different state or association, the breeder would have to join that registry. This increased the overhead cost of the breeder, as well as lowered the price of a deer. Deer prices suffered because lineage verification required substantial work and was of questionable reliability.

In 2007, the Associations joined forces to create the North American Deer Registry, Inc. ("NADR"). NADR is comprised of five board members from each of the Associations plus two board members from a Mexican association. To be a member of the NADR, a breeder only needed to be a member of either the Texas Deer Association or the North American Deer Farmer's Association. This allows breeders to gain access to a larger database to confirm lineage, therefore reducing overhead costs.

DNA Solutions, Inc. ("DNAS") began performing DNA lineage verification in 2000 when both Associations employed DNAS. DNAS hosted a registry for each Association that performed DNA testing and confirmed lineage for the deer profiles therein. Each registry restricted DNAS's ability to compare lineages only to those deer within the respective registry.

DNAS's service can be broken down in two steps. First, DNAS performs a DNA analysis wherein DNAS creates a genetic profile of the deer. This profile is comprised of various DNA markers known to the public. The second step uses DNAS's proprietary system to interpret DNA markers and compare them to other deer related in the first-degree. From DNAS's proprietary system, they are able to create or verify the lineage of each deer sample.

In 2007, NADR hired DNAS to host its registry (the "Registry"). The contract required DNAS to process deer genetic information, perform matching services, and host a database for NADR's information, which would be accessible online. As part of the agreement, DNAS agreed to preserve the confidentiality of NADR's information and to return such information upon termination of DNAS's services. Also under this agreement, DNAS performed most of the client outreach for NADR and DNAS accepted samples directly at its office in Oklahoma City.

In 2013, NADR reduced DNAS's role in their relationship. The 2013 contract eliminated DNAS's role in administration and client outreach. Under this agreement, clients sent samples to

NADR in Edmond, Oklahoma, rather than to DNAS. As part of NADR's new client outreach role, clients were directed to call NADR directly with questions or concerns. NADR forwarded the question to DNAS, who answered NADR, and finally NADR would inform the client. Debra Lyon ("Lyon") and Dr. Brandt Cassidy ("Cassidy") testified for DNAS that the switch in 2013 caused some confusion with customers who did not understand the evolving relationship between NADR and DNAS.

The parties further revised their agreement in 2014 (the "Contract"). The Contract terminated by its terms on January 1, 2017.

Under the Contract, NADR retained ownership of all biological materials, genetic information, genotype analysis data, membership directory, and any other information provided by NADR. DNAS, on the other hand, retained ownership of any code it created because of running the registry. DNAS agreed to keep confidential the content of the registry or any other information it received from NADR in the performance of the Contract or in its prior dealings with NADR. DNAS further agreed that, upon termination of the Contract, it would return all information provided by NADR.

On January 27, 2017, NADR filed a complaint, alleging unfair competition under the Lanham Act, misappropriation of trade secrets, constructive trust, unjust enrichment, and requesting injunctive relief (Dkt. #1). The same day, NADR made a demand for arbitration seeking relief for breach of contract, temporary and permanent injunctions, declaratory judgment, and attorneys' fees (Dkt. #21, Exhibit 2). On February 27, 2017, NADR filed its Application for Preliminary Injunction (Dkt. #17). On March 14, 2017, DNAS filed a response (Dkt. #21). On March 21, 2017, NADR filed a reply (Dkt. #23). On March 28, 2017, DNAS filed

a sur-reply (Dkt. #26). On May 17 and 18, the Court held an evidentiary hearing on NADR's application.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat plaintiffs will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage the injunction might cause the defendant; and (4) the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "'is not required to prove its case in full at a preliminary injunction hearing.'" *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

Before addressing the merits, the Court must assess its jurisdiction to grant injunctive relief. DNAS continues to argue the Court does not have jurisdiction to grant injunctive relief. DNAS argues that injunctive relief is proper for the arbitrator because: (1) the arbitration clause is broad and encompasses injunctive relief; (2) NADR requested injunctive relief in its demand for arbitration; and (3) any determination by the Court will necessarily interfere with the arbitration proceedings.

NADR claims that the Court does have jurisdiction. NADR argues: (1) the arbitration provision is narrow and does not prefer either the Court or arbitrator to order injunctive relief; (2)

the arbitrator could not even order injunctive relief; and (3) the Court may enter injunctive relief in order to preserve the status quo pending arbitration. During closing arguments of the hearing, NADR went even further to argue the Court can order injunctive relief over even the breach of contract claim, which is undisputedly in front of the arbitrator.[1]

NADR did not request relief over its breach of contract claim in its application. Therefore, the Court will only address the claims argued in the application: Lanham Act, trade secrets, unjust enrichment, and constructive trust (the "non-contract claims"). Based on the foregoing analysis, the Court finds it has jurisdiction to order injunctive relief over the non-contract claims.

First, the non-contract claims are properly before this Court and are not subject to arbitration. The Court has already entered an order regarding the arbitrability of NADR's claims (Dkt. #43). The Court found NADR's claims under the Lanham Act were not subject to arbitration (Dkt. #43 at p. 10). The Court denied DNAS's motion as to NADR's trade secret claims, but left open the question of whether the basis for NADR's claim was so related to the contract that it should be ultimately sent to arbitration (Dkt. #43 at p. 10).

After a hearing, the Court finds NADR's trade secret claims are not subject to arbitration. NADR developed its trade secret deer profiles, lineages, and member list over several years pre-dating the Contract. NADR is composed of two other associations that have been in existence for many years. The other associations had their own contracts with DNAS beginning in 2000. Since 2000, they have developed deer profiles, lineages, and member lists independently from the Contract. While the Contract will be evidence of protection of the trade secrets and NADR's entrustment of information to DNAS, it is not dispositive of the entire trade secret history.

---

[1] At the hearing, NADR mentioned that it withdrew certain requests from the arbitrator's consideration. The Court did not allow evidence of those claims, however, the Court notes that the claims before the arbitrator are now more limited.

Therefore, the trade secret claims are not subject to arbitration under the narrow arbitration provision in the Contract.

Further, the Court has jurisdiction to order injunctive relief to preserve the status quo. The Fifth Circuit recognizes the general authority of a district court to enter injunctive relief to maintain the status quo. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). In *Janvey*, the Fifth Circuit recognized a circuit split over the question of whether a district court has power to enter an injunction while arbitration is pending. *Id.* at 592. However, the Fifth Circuit held that the circuit-split cases were not applicable because it had not yet decided whether the case was arbitrable. *Id.* at 594. Similar to *Janvey*, the circuit-split cases are not applicable to the non-contract claims because the court has determined those claims are not subject to arbitration at all.

Without Fifth Circuit precedent on the issue, the parties cite opposing district court opinions from districts in Texas to support their positions.

DNAS cites *Grasso* to argue that the Court should not enter injunctive relief because it would "necessarily would inject the court into the merits of issues more appropriately left to the arbitrator." *Grasso*, 143 F. Supp. 3d at 543 (quoting *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1292 (8th Cir. 1984)). In its sur-reply, DNAS also cites *East El Paso Physicians' Medical Center, LLC v. Aetna Health Inc.*, to argue that the Court cannot order injunctive relief when it is inextricably linked with the agreement. No. EP-16-CV-44-KC, 2017 WL 876313, at *15 (W.D. Tex. Mar. 2, 2017).

NADR cites *Amegy Bank National Association v. Monarch Flight II, LLC* to argue that most circuits that have addressed this issue have held that a district court may enter injunctive relief to preserve the status quo pending arbitration. 870 F. Supp. 2d 441 (S.D. Tex. 2012). In *Amegy*, the court entered an injunction before ruling on the motion to compel arbitration. *Id.* at

451. The court then decided the motion to compel arbitration and determined all claims should be tried in arbitration. *Id.* at 450–51. Having gone a step further than *Janvey* by deciding the arbitrability of disputes, the court dealt with the circuit split *Janvey* avoided. *Id.* at 451–52. In recounting the circuit split, the court recognized that only the Eighth Circuit reached the result that a district court cannot order injunctive relief when all claims are sent to arbitration. *Id.* at 452. The court also recognized that most district courts in the Fifth Circuit follow the majority position. *Id.* The court went on to hold that a court should be able to order injunctive relief pending arbitration so that the parties are not able to "continue maneuvering to the disadvantage of each other outside the arbitration model." *Id.* (citation omitted).

The Court agrees with the majority of circuits that a district court has discretion to grant injunctive relief to preserve the status quo pending arbitration. First, DNAS's cases are distinguishable simply because they involved broad arbitration clauses. Broad arbitration clauses embrace "all disputes between the parties having a significant relationship to the contract." *E. El Paso*, 2017 WL 876313, at *13. Here, the arbitration clause is narrow. It only encompasses disputes that fall within the scope of the clause. Injunctive relief does not fall within the scope of the arbitration clause. The Fifth Circuit has held that when an arbitration provision is limited to "interpretation" of the contract, then the parties intend that their dispute be governed by the four corners of the agreement. *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 410 (5th Cir. 1990). In *United Offshore*, the court found that the contract did not provide a means by which the arbitrator could resolve the dispute because there was not remedy within the four corners of the contract. *Id.* Similarly here, the Contract does not provide any means by which the arbitrator could resolve a dispute as to the non-contract claims. Therefore, the non-contract claims do not fall within the arbitration clause.

Further, as the *Amegy* court recognized, *Hovey* and *Grasso* are parts of an extremely small minority. The majority of courts in the circuit split considered *Hovey* and refused to follow it. *See, e.g.*, *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049 (2d Cir. 1990); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806 (3d Cir. 1989); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985).

Finally, the Court does not interpret *Hovey* to foreclose this result. *Hovey* held "where the Arbitration Act is applicable and no qualifying contractual language has been alleged, the district court errs in granting injunctive relief." *Hovey*, 726 F.2d at 1292. Here, neither prong is satisfied. The Court found the Federal Arbitration Act ("FAA") does not apply because the non-contract claims are not subject to arbitration. There is also qualifying language in the Contract. The parties did not agree to arbitrate injunctions. The parties agreed to arbitrate disputes concerning interpretation of the Contract. Injunctive relief does not fall within the scope of the arbitration clause. *See United Offshore Co.*, 899 F.2d at 410.

As the majority of circuits have found, this position is more consistent with, and necessary to enforce, the federal policy on arbitration. *Amegy*, 870 F. Supp. 2d at 452. The First Circuit explained, "the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration." *Teradyne*, 797 F.2d at 51. "A district court must ensure that the parties get what they bargained for—a meaningful arbitration of the dispute." *Blumenthal*, 910 F.2d at 1053. Put simply, if the court is unable to order injunctive relief, arbitration may become moot because the harm to NADR would be beyond repair.

Now, the Court will analyze the merits of NADR's application for preliminary injunction.

# I. Likelihood of Success on the Merits

To prevail on their motion for preliminary injunction, NADR must demonstrate a substantial likelihood of success on the merits. This requires NADR to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey*, 647 F.3d at 595–96). A prima face case does not mean NADR must prove it is entitled to summary judgment. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). NADR has demonstrated a substantial likelihood of success on all of its claims.

## A. Lanham Act

To establish a claim for false designation of origin or unfair competition under the Lanham Act a plaintiff must prove:

> (1) A false or misleading statement of fact about a product;
> (2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers;
> (3) The deception was material, in that it is likely to influence the consumer's purchasing decision;
> (4) The product is in interstate commerce; and
> (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

*IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002). Defendant's intent is not an element, although it may be considered as a factor in determining the likelihood of confusion. *See Am. Rice, Inc. v. Prods. Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

### 1. False or Misleading Statement

An essential element of a claim for unfair competition is that the challenged statement is one of fact. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–95 (5th Cir. 2000). A statement of fact is one that "(1) admits of being adjudged true or false in a way that (2) admits of empirical verification." *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986). The challenged statement must make a "specific and measureable claim,

capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Pizza Hut*, 227 F.3d at 496 (quotations omitted).

NADR asserts DNAS made false or misleading statements regarding the true owner and "legitimate heir" to the Registry. NADR argues DNAS misled consumers by advertising that it had a database of over 230,000 deer genetic profiles and could offer "comparisons and lineages for white-tailed deer and mule deer across North America" (Pl. Exhibit 7). NADR argues this confusion was furthered by DNAS claiming it will "continue" providing DNA services and equating its services to the "gold-standard," a phrase used by NADR for several years and in connection with the Registry.

DNAS argues its representations cannot be false because they own the database. DNAS asserts a provision in the Contract allows DNAS to retain "any information developed by DNAS incidentally through the performance of its services hereunder that analyze or organize the collective databases" (Pl. Exhibit 3 at ¶ 7). DNAS also relies on the provision that allows DNAS to "use, sell, create derivative works of, assign, transfer, license and sublicense the Code" (Pl. Exhibit 3 at ¶ 6).

The Court disagrees with DNAS's assertion of ownership and finds that its representations were false or misleading. DNAS selectively reads the Contract to assert its "database" is much larger than the Contract provides.[2] Throughout the hearing and in its response to the motion, DNAS continually asserted the "database" is a giant repository of information DNAS created and is entitled to keep. DNAS attempts to skirt the Contract and its seemingly clear terms by bending backwards to explain its process.

---

[2] When used in quotes, "database" refers to DNAS's meaning of the term. The Contract does not define database, although it is used many times. The Court seeks to distinguish DNAS's use of the term from any contractual or colloquial use of the term.

DNAS explains its process as follows. DNAS receives samples from breeders to perform DNA analysis. DNAS then tests the samples to derive genetic markers. DNAS then puts all of the raw information into a repository of all DNA data it has ever created. DNAS calls this repository its "database." From this repository, DNAS offers its services to interpret the data and to create a "registry" for its client.[3] DNAS then processes the subset of information in a way desired by the client in order to create the registry. DNAS claims the registries that its clients purchased were just a subset of information taken from the "database." In this case, DNAS processed deer genetic profiles in order to create and confirm lineages.

DNAS's reading seems to render the Contract meaningless. The Contract defined more than twenty terms in an effort to clarify the relationship and to protect the parties' rights. Importantly, the Contract defined terms for "Biological Materials," "Genetic Information," "Genotype Analysis Data," "Registry," "Registration Data," "Membership Directory," "Code," "Retained Rights," "NADR Information," "DNAS Data," and "Confidential Information." DNAS is correct in its assertion that the Contract does not define database. Nevertheless, it is clear the database referenced in the Contract is nowhere near as broad as DNAS claims.

The definition for "DNAS Data" expressly excludes "NADR Information." NADR Information includes "Biological Materials, Genetic Information, Genotype Analysis Data, Membership Directory and any other information provided by NADR or its members to DNAS." After reviewing the Contract, hearing evidence, and arguments of counsel, the Court finds the

---

[3] DNAS defines a registry in its marketing materials as:
- A repository of genetic information that allows for the development of extensive pedigrees used to select for desirable genetic traits that improve the value of your animals
- A central location for identifying information including pictures, date of birth, ownership, ear tags, microchips
- Electronic storage of animal information that is easily retrieved

(Pl. Exhibit 14 at NADR000214).

definition of NADR Information does not allow DNAS to keep any of the information related to DNA that has been presented to the Court.

### 2. Deception of a Substantial Segment of Potential Customers

Next, a plaintiff must show the statement was "(1) literally false; or (2) likely to mislead and confuse customers." *IQ Prods.*, 305 F.3d at 375 (citing *Pizza Hut*, 227 F.3d at 495). If the statement is literally false, the court must assume it actually misled consumers, without requiring evidence of the impact of the statements on consumers. *Pizza Hut*, 227 F.3d at 497. If the statement is shown to be misleading or ambiguous, however, the plaintiff must introduce evidence of the statement's impact on consumers, referred to as materiality. *Id.* at 495. The type of evidence needed to prove materiality varies depending on the type of recovery plaintiff seeks. *Id.* Plaintiffs seeking injunctive relive must prove the defendant's representations "have a tendency to deceive consumers." *Id.* (quoting *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 690 (6th Cir. 2000)).

NADR has met its burden to show a likelihood that DNAS's statements were literally false. As explained above, DNAS did not have any rights to keep the DNA information as it did. Therefore, DNAS's statements were literally false in claiming they had a large registry that it owned a registry of over 230,000 deer profiles and that it could provide comparisons. As such, the Court must assume DNAS's statements actually misled consumers. Because DNAS's statements were literally false, NADR has established the second and third element of their Lanham Act claim. *Pizza Hut*, 227 F.3d at 497 ("With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers.").

*3. Interstate Commerce*

DNAS admits the Registry is used in interstate commerce. The Court finds DNAS's advertising involved interstate commerce.

## B. Trade Secrets

A claim for misappropriation of trade secrets requires: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836(b)(1). A trade secret includes all business information, including compilations, if the owner has taken reasonable measures to keep such information secret that derives independent economic value from not being generally known to and not being readily ascertainable by another person who can obtain economic value from the disclosure or use of the information. *Id.* § 1839(3). Misappropriation is satisfied if disclosure of the trade secret is made, without consent, by a person who acquired the knowledge under circumstances giving rise to a duty to maintain its secrecy. *Id.* § 1839(5). "Improper means" includes breach of a duty to maintain secrecy, but does not include reverse engineering or independent derivation. *Id.* § 1839(6).

Oklahoma has adopted the Uniform Trade Secrets Act, which has similar elements to the federal act. *See* Okla. Stat. tit. 78, §§ 85–95. Misappropriation and improper means have the same definitions under the federal and Oklahoma acts. *Compare* 18 U.S.C. § 1839 *with* Okla. Stat. tit. 78, § 86.

*1. Trade Secret*

A trade secret includes compilations of data that the owner has taken steps to keep secret and that derive independent economic value. NADR argues it has trade secret information in the form of its deer genetic profiles, deer lineages, and member list that have been created and compiled by their members, before and during the Contract with DNAS.

DNAS argues in its brief that the deer genetic information, deer lineages, and membership directory are not trade secrets because (1) DNAS rightfully obtained rights to the genetic information which it can now derive lineages from and (2) the Court could not fashion an injunction to properly address any non-NADR information. DNAS argues the biological material and genetic data create the "database." DNAS argues NADR only purchased selections from the "database" from which it created the Registry. Therefore, DNAS argues it is allowed to compare data that is stored in its own "database." At the hearing, DNAS also argued that NADR made several portions of its Registry public through auction brochures or other advertising.

NADR's member list, deer genetic information, and deer lineages are its trade secrets. NADR expended significant time and effort in creating its Registry. Cassidy and Lyon each recognized that no other deer registry has as many as 230,000 animals. Further, NADR took significant steps to keep its biological materials, genetic information, genotype analysis data, and membership directory secret. NADR's efforts have been memorialized in three contracts it had with DNAS and in the previous agreements of the North American Deer Farmers Association and Texas Deer Association. Finally, the economic value of each trade secret is derived from the compilation of many data points that are not readily ascertainable by the public. While small pieces of the Registry have been made public, this has not been enough to affect the economic value of NADR's secret.

Cassidy testified that the economic value of the Registry flows from the deer lineages. Cassidy also testified that a hole in a lineage would impair the value of the Registry. The sparse amount of information that is available to the public through either advertising or auction brochures is not sufficient to seriously affect the value of the Registry. A person compiling these tidbits of information would inevitably be left with numerous holes in lineages across their

compilation. Even if a person could successfully put together a reputable compilation based solely off the public disseminations from the Registry, it would take a significant amount of time and effort. The Court finds NADR has met its burden in showing that its compilations are trade secrets and DNAS's arguments have failed to rebut this.

Finally, the Court disagrees that there is an impediment to drafting appropriate injunctive relief that would prohibit use of and comparisons to the trade secret information DNAS was entrusted with during the Contract.

### 2. Misappropriation

DNAS misappropriated NADR's trade secrets when it did not return the information according to the Contract. DNAS argues that it did return all information it was required to return under the Contract. However, DNAS contends that it can keep the same information because it is part of its "database." Essentially, DNAS argues that it can return information while retaining the same information, as long as the information is in two different places. The Court disagrees with such a strained reading of the word "return."

Courts read a contract to give meaning to the parties' intent. Okla. Stat. tit. 15, § 155. The contract is read as a whole, giving effect to all words. *Id.* § 157. The intent of the parties may also be ascertained from the language in the title of a section. *Jones v. State ex rel. Office of Juvenile Affairs*, 268 P.3d 72, 77 (Okla. 2011); *Atkinson v. Halliburton Co.*, 905 P.2d 772, 775 (Okla. 1995).

The "Return of Information" provision in the Contract requires DNAS to "deliver to NADR all NADR and NADR member Information, Biological Materials, Genetic Information and Genotype Analysis Data, along with the Registry in the form of a report in the manner in which it is available in the current software" (Pl. Exhibit 3 at ¶ 8). The Contract defines each

capitalized term. The next section of the Contract defines confidential information as "any of the content of the Registry or any other information it gains from NADR and/or NADR members in the performance of this Agreement" (Pl. Exhibit 3 at ¶ 9).

DNAS seems to read the return of information provision to only require delivery of information, rather than a complete return. However, the title of the section and reading the Contract as a whole makes it clear that the Contract requires DNAS to return all DNA information and not keep any for their own use.

DNAS admitted to creating two copies of information when it compiled its "database." DNAS put the information in its "database," but then also took selections of that information to create the Registry. DNAS also used member information collected during and in connection with the Contract. DNAS selected certain individuals from that list and contacted them to offer DNAS as an alternative service to NADR (*See* Pl. Exhibit 6). DNAS obtained the info while under a duty to maintain its secrecy, but then used it without permission. These are all misappropriations of NADR's trade secrets.

### 3. Interstate Commerce

DNAS admits the Registry is used in interstate commerce. Therefore, this element is established.

### C. Constructive Trust and Unjust Enrichment

NADR does not address its claims for constructive trust and unjust enrichment in its brief. It would be inappropriate to address these claims at this time because they are remedies for the Lanham Act and trade secret claims. It bears noting however, that the remedies are available under the Defend Trade Secrets Act and Oklahoma Uniform Trade Secrets Act. 18 U.S.C. § 1836(b)(3)(B)(i)(II); Okla. Stat. tit. 78, § 88.

## II. Likelihood of Irreparable Harm

NADR must demonstrate it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

A court may presume irreparable injury for a Lanham Act claim when a plaintiff shows a "likelihood of confusion." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626–27 (5th Cir. 2013). The Court has found NADR established a likelihood of confusion for its Lanham Act claim because DNAS made literally false statements. DNAS boasts its long history in the deer breeding industry and boasts 230,000 deer profiles; a number DNAS admits is synonymous with the NADR registry. DNAS does not own any rights to the Registry. DNAS also claims that it can provide comparisons with all of the deer profiles. It cannot. Therefore, DNAS is making literally false statements regarding the size of the registry that it has rights to as well as misleading customers as to its affiliation with the NADR Registry. NADR has met its burden in proving likelihood of irreparable injury on its Lanham Act claim.

The Defend Trade Secrets Act and Oklahoma Uniform Trade Secrets Act allow a court to grant an injunction to prevent any "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3); Okla. Stat. tit. 78, § 87; *see Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004). The Court has already found NADR has a substantial likelihood of prevailing on its trade secret claim because DNAS is likely misappropriating trade secrets in multiple ways. It would be difficult to measure the effect on NADR's goodwill due to any gaps created in lineages by a loss of market share. *See Novartis*, 290 F.3d at 596 ("In a competitive

industry where consumers are brand loyal . . . loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial." (citation omitted)). Further, Cassidy admitted that holes in lineages would be harmful. DNAS has contacted NADR members regarding the registry and is offering to continue the same services it provided while under contract with NADR. NADR has also proved DNAS has been successful in luring several customers away. Although NADR has the same number of members and samples as this time of previous years, that does not mean that it has not and will not lose market share. The mere fact that some members have decided to work with DNAS means NADR has lost a part of the market. A stagnant number in a growing market is a loss in market share. Therefore, the Court finds NADR has met its burden in proving likelihood of irreparable injury.[4]

DNAS argues NADR's injury is not irreparable because NADR has waited five months to seek an injunction. The Court disagrees. NADR filed its complaint and application for preliminary injunction on the same day, January 27, 2017. Due to the Court's local rules, NADR was required to re-file its application as a separate motion, which it did on February 22, 2017. In the meantime, NADR sought expedited discovery, which the Court granted on February 8, 2017 (Dkt. #8). Despite the Court's order, DNAS moved to quash the expedited depositions on February 17, 2017 (Dkt. #13). Due to the Court's calendar, it did not resolve the motion to quash until April 21, 2017 and could not schedule a hearing on the application until May 17, 2017. Therefore, NADR did not unreasonably delay seeking an injunction.

### III. Balance of Hardships

When deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the

---

[4] DNAS even recognized in the Contract that "it would be very difficult, if not impossible to accurately quantify the damages that NADR would suffer in the event DNAS disclose any of NADR's confidential, proprietary information to a third party" (Pl. Exhibit 3 at ¶ 9).

requested relief." *Winter*, 555 U.S. at 9 (citation omitted). DNAS argues it would be harmed more than NADR because DNAS has more employees and because DNAS allegedly owns the data that it retained. The Court is not convinced by either argument. The fact that a bigger company will have to lay off more employees than a non-profit organization does not weigh against an injunction. Further, DNAS's argument that it owns the retained data assumes its interpretation is correct. The Court has explained how DNAS's interpretation is flawed and will likely not prevail in arbitration.

On the other hand, if DNAS is allowed to operate with NADR's trade secrets, NADR will lose its only asset as it will be used by a competitor and therefore will be public, losing its secret status. The balance of the hardships weighs in favor of NADR.

## IV. The Public Interest

"'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312). This factor overlaps substantially with the balance-of-hardships requirement. *Id.* NADR argues that it is in the public interest to enforce valid contracts and the Lanham Act. DNAS argues that an injunction is against the public interest because it is against public policy to force companies out of business and because public policy favors arbitration. As discussed in this order and the Court's previous order (Dkt. #43), the claims before this Court are outside the scope of the arbitration provision. Further, this Court has the power to maintain the status quo in order to enforce arbitration provisions. It is in the public interest that arbitration provisions have an effect and are not a "hollow formality." *Blumenthal*, 910 F.2d at 1053. Finally, it is in the public interest to enforce contracts and existing law.

According to the Court's interpretation of the law and as it applies to the facts in this case, the public interest would be best served by enjoining DNAS from using NADR's trade secrets.

**CONCLUSION**

It is therefore **ORDERED** that Plaintiff North American Deer Registry, Inc.'s Application for Preliminary Injunction (Dkt. #17) is hereby **GRANTED**.

It is further **ORDERED** that DNA Solutions, Inc., its officers, agents, representative, employees and successors, and all other persons in active concert and participation with it, are hereby enjoined from engaging in the following acts:

a) DNAS shall not use, offer to use, alter, delete, modify, disclose, or permit access to the Registry, the Biological Materials, Genetic Information, Genotype Analysis Data, Registration Data, Membership Directory, or any other information provided by NADR or its members to DNAS or any copy of the same (electronic, paper, or otherwise) or information derived from such information for any purpose.

b) DNAS shall not use, offer to use, or disclose to any other entity or individual any of the content of the Registry or any other information it gained form NADR and/or NADR members in the performance of any of its prior dealings with NADR ("Confidential Information"), until further order of the Court. Such Confidential Information shall include, but not be limited to, the identity and contact information of persons and organizations who previously did business with DNAS under agreements with NADR.

c) DNAS shall not represent in commerce that it owns or has the right to disclose or access or offer access for commercial purposes, a database containing deer genetic profiles if any of such deer genetic profiles contained therein were provided by NADR, or a member of NADR.

d) DNAS shall not use the information maintained in the Registry, Biological Materials, Genetic Information, Genotype Analysis Data, Registration Data, Membership Directory, or any other information provided by NADR or its members to DNAS to build or operate a registry.

It is further **ORDERED** that unless terminated earlier, this preliminary injunction shall expire upon the issuance of a final decision by the Court in this case.

It is further **ORDERED** that this preliminary injunction shall not be effective unless and until Plaintiff has filed an appropriate bond or cash deposit in lieu thereof in the amount of $20,000.

 **SIGNED this 2nd day of June, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE